# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Anne Marie Rasmusson,

        Plaintiff,

v.

City of Bloomington; City of Burnsville;
City of Cottage Grove; City of Eagan;
City of Eden Prairie; City of Lakeville; City of
Minneapolis; City of Minnetonka; City of St.
Paul; Ramsey County; University of
Minnesota; Charles Gollop, acting in his
individual capacity as a Sergeant of the
Bloomington Police Department; Sean
Sweeney, acting in his individual capacity as
an Officer of the City of Eagan Police
Department; Zachary Hessel, acting in his
individual capacity as an Officer of the Eden
Prairie Police Department; Christopher
Millard, acting in his individual capacity as an
Officer of the Eden Prairie Police Department;
Carter Staaf, acting in his individual capacity
as a Sergeant of the Eden Prairie Police
Department; Chris Erickson, acting in his
individual capacity as a Lieutenant of the
Minnesota State Patrol; Dean Grothem, acting
in his individual capacity as a Trooper of the
Minnesota State Patrol; Michael Campion,
acting in his individual capacity as
Commissioner of the Minnesota Department of
Public Safety; Mona Dohman, acting in her
individual capacity as Commissioner of the
Minnesota Department of Public Safety; John
and Jane Does (1 - 120) acting in their
individual capacity as supervisors, officers,
deputies, staff, investigators, employees or
agents of the other named law-enforcement
agencies; and Entity Does (1-20) including
cities, counties, municipalities, and other
entities sited in Minnesota and federal
departments and agencies,

        Defendants.

Case No. 12-632 SRN/JSM

**COMPLAINT**

**JURY TRIAL DEMANDED UNDER FRCP 38(b)**



For her Complaint, for which she demands trial by jury on all claims so triable, Plaintiff

Anne Marie Rasmusson ("Rasmusson") hereby states and alleges as follows:

## INTRODUCTION

The United States Supreme Court long has recognized privacy as a fundamental

constitutional right protected by the U.S. Constitution and entitled to protection from

encroachment by the States, both under the Fourth and Fourteenth Amendments and under

various protections extended to the people of the United States by the Bill of Rights.  To enforce

those rights, the legislative branch of our federal government has adopted a strict approach to the

protection of privacy interests, particularly in the past twenty years.  Recognizing that law

enforcement personnel, among others, have the ability to access any person's private

information, especially that information retained by the State in connection with a driver's

license, Congress passed legislation commonly known as the Driver's Privacy Protection Act of

1994 ("DPPA") to safeguard this information.  In a separate but related vein, in 1997 the

Minnesota Supreme Court first recognized the tort of invasion of privacy.  This case involves the

invasion of privacy and illegal searches of Plaintiff Anne Rasmusson by approximately 100

Minnesota law-enforcement officers, who accessed her private information approximately 400

times in the time period 2007 to fall of 2011, and probably more times before and after that time

period, without any legitimate business reason to do so, and who not only violated the DPPA, 42

U.S.C. § 1983 and state law, but have damaged Plaintiff Rasmusson's life by these violations.

Plaintiff is entitled to a determination that her rights have been violated, to an order enjoining

further violations, and to monetary damages for these invasions of her privacy.

### General Background of Law and Facts

1.      This is an action for injunctive relief and money damages for injuries sustained

when approximately 100 law-enforcement personnel in Minnesota—and perhaps more—illegally

viewed Plaintiff Anne Marie Rasmusson's private, personal, and confidential driver's license

2

information without a legitimate purpose. These law-enforcement personnel viewed her private information in excess of 400 times from the period 2007 to the fall of 2011; presumably more had viewed it prior to 2007 and more after the fall of 2011. Each unauthorized use of her private information, made while acting under color of state law, violated Rasmusson's federal civil rights and constituted behavior prohibited by federal statute, Minnesota statute, common law, and agency and departmental regulations prohibiting some or all of the conduct engaged in by Defendants in this case.

2.      Rasmusson brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth Amendment of the United States Constitution, 28 U.S.C. §§ 1331 and 1343(a)(3), the Driver's Privacy Protection Act ("DPPA") 18 U.S.C. § 2721 et seq., and Minnesota common law invasion of privacy. The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.      The amount in controversy exceeds $75,000, excluding interests and costs.

**The Parties**

4.      Rasmusson is, and was at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

5.      Defendant City of Bloomington is a home-rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

6.      Defendant City of Burnsville is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

7.      Defendant City of Cottage Grove is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

8.      Defendant City of Eagan is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

3

9.      Defendant City of Eden Prairie is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

10.     Defendant City of Lakeville is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

11.     Defendant City of Minneapolis is a home-rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

12.     Defendant City of Minnetonka is a home-rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

13.     Defendant City of St. Paul is a home-rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

14.     Defendant Ramsey County is a county in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq.

15.     University of Minnesota was established by Article XIII of the Minnesota Constitution and can be sued under Minn. Stat. § 3.736 et. seq.

16.     Defendants Entity Does (1-20) are various cities, counties, municipalities and other entities sited in Minnesota, which can be sued under Minn. Stat. § 466.01 et. seq. or other statutes, and federal departments and agencies, which can be sued under 28 U.S.C. § 1346 or other statutes.

17.     Plaintiff will refer to the entities named in paragraphs 5-16 above collectively as the "Defendant Entities" or "Entity Defendants."

18.     Defendant Charles Gollop ("Gollop"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Sergeant of the Bloomington Police Department.

4

19.     Defendant Sean Sweeney ("Sweeney"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Eagan Police Department.

20.     Defendant Zachary Hessel ("Hessel"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Eden Prairie Police Department.

21.     Defendant Christopher Millard ("Millard"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Eden Prairie Police Department.

22.     Defendant Carter Staaf ("Staaf), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Sergeant of the Eden Prairie Police Department.

23.     Defendant Chris Erickson ("Erickson"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Lieutenant of the Minnesota State Patrol.

24.     Defendant Dean Grothem ("Grothem"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Trooper of the Minnesota State Patrol.

25.     Defendants John and Jane Does (1-120), upon information and belief, were, at all times material herein, citizens of the United States and residents of the State of Minnesota, duly appointed and acting in their individual capacities as law-enforcement supervisors, officers or

employees of the Defendant Entities or other federal, state, county or municipal entities in Minnesota.

26.     Plaintiff will refer to the individual Defendants (with the exception of the "Commissioner Defendants" and "Supervisor Defendants" defined below), including John and Jane Does, collectively as the "Defendant Law-Enforcement Personnel," "Individual Defendants," or "Defendant Individuals."

27.     Plaintiff will refer to the Defendants with supervisory authority over the Individual Defendants, including any John and Jane Does with such supervisory authority, collectively as the "Defendant Supervisors" or "Supervisor Defendants."

28.     Defendant Michael Campion ("Campion"), upon information and belief, was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as the Commissioner of the Minnesota Department of Public Safety.

29.     Defendant Mona Dohman ("Dohman"), upon information and belief, was, at all times material herein, a citizen, of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as the Commissioner of the Minnesota Department of Public Safety.

30.     Plaintiff will refer to the Defendants Campion and Dohman collectively, as the "Commissioner Defendants" or "Defendant Commissioners."

## FACTUAL ALLEGATIONS

### I. Rasmusson Served Honorably as a Law-Enforcement Officer

31.     In 1996, Rasmusson graduated from the police academy at Range Technology College in Hibbing, Minnesota.  She was elected as a Sergeant of her class.

32.     Immediately after graduation, in May 1996, she became a park ranger for the City of Eden Prairie, Minnesota.

33.     In December 1996, Rasmusson became a police officer for the Eden Prairie Police Department.  She worked as a patrol officer.

34.     Rasmusson was injured in the line of duty on June 6, 1999, while on a medical emergency call.  During that call, she needed to move some furniture, and, while doing so, snapped her coccyx (tail bone).

35.     In March 2000, Rasmusson underwent surgery related to that injury where her coccyx and partial sacrum were removed.

36.     Despite the injury and surgery, Rasmusson returned to duty.

37.     In 2001, Rasmusson became a police officer for the City of St. Paul, Minnesota. St. Paul requires lateral hires such as Rasmusson to attend their police academy.  While there, Rasmusson became the first female academy president in the department's history.

38.     In St. Paul, Rasmusson worked as a patrol officer in the West District, commonly known as the "Frogtown" neighborhood.

39.     In 2003, Rasmusson began to experience numbness in her leg and had difficulty sitting.  She was diagnosed with nerve damage and an unstable pelvis.  Based on this diagnosis, she was granted a full-medical retirement on December 17, 2003.

40.     Rasmusson was deeply disappointed that she had to retire.  Until the revelation of the massive invasion of privacy in this case, retirement was one of the worst things to happen in her life.

41.     In 2004, Rasmusson moved to her rural home in northern Minnesota.

42.     Rasmusson was never disciplined while on the force.

43.     Rasmusson was proud to serve as a police officer.

II.    **Over 100 Minnesota Law Enforcement Officers Viewed Rasmusson's Private Information Outside the Scope of Any Investigation or Official Police Business**

44.    As early as July 2006, law enforcement officers began looking up Rasmusson's private information on the Department of Vehicle Services' ("DVS") database.

45.    The officers viewed Rasmusson's private personal and highly-restricted personal information from her State-issued driver's license including her home address, color photograph or image, and driver identification number.

46.    Under the direction of the Commissioner Defendants, the Minnesota Department of Public Safety ("DPS"), created the DVS database that includes Rasmusson's driver's license information and the system for law-enforcement personnel to access to that information.

47.    DPS, under the direction of the Commissioner Defendants, maintained and updated the database that includes Plaintiff's driver's license information.

48.    DPS, under the direction of the Commissioner Defendants, provided access to the database that included Plaintiff's driver's license information.

49.    DPS, under the direction of the Commissioner Defendants, had the ability to determine that drivers' license information, including Plaintiff's, was being accessed on multiple occasions, by multiple law-enforcement personnel from multiple law-enforcement agencies.

50.    DPS, under the direction of the Commissioner Defendants, had the ability to prevent unauthorized access to the database, including unauthorized access to Plaintiff's driver's license information.

51.    DPS, under the direction of the Commissioner Defendants, failed to prevent unauthorized access to the database, including access to Plaintiff's driver's license information.

52.    Rasmusson began having suspicions that law enforcement officers were taking an uncomfortable interest in her starting approximately in 2007.  She had recently divorced, and numerous officers who asked her for dates knew where she lived or what kind of car she drove.

53.     In mid-2009, Rasmusson began to distance herself from law-enforcement get-togethers and from police officers, even those who were her former colleagues and those whom she considered her friends.  More and more she began to live a secluded, even hermit-like, reclusive existence.

54.     On May 5, 2010, Rasmusson was pulled over for a potential speeding violation by a Minneapolis police officer.  Although the officer did not issue a citation against her, three other squad cars arrived on the scene and then left without performing any known law enforcement duties.

55.     In early July 2010, Rasmusson changed her cell phone number and personal email address, and moved from Lakeville back to northern Minnesota.  She told few people of her move and ceased contact with the majority of police acquaintances from then on.

56.     Based in part on these foregoing incidents, Rasmusson contacted DPS to inquire whether law enforcement officers had been viewing her private information.  She asked that only those officers who had run her name—as opposed to her license plates—on the DVS computer database be identified.

57.     On August 30, 2011, she was unpleasantly surprised, even horrified to learn from DPS that it had determined that law-enforcement officers from 18 different departments and agencies had reviewed her private driver's license information since 2007.  She became physically ill upon learning that fact; she pulled over, opened her car door, and vomited.

58.     In October 2011, she learned through the press that approximately 100 law-enforcement officers had accessed her private driver's license information approximately 400 times in the last four years, from 2007 through the fall of 2011.

59.     Upon learning of the sheer volume of intrusions, Rasmusson again became physically sick.

60.     On information and belief, Rasmusson believes that this number is only a partial list of the illegal accesses of her information, and that more illegal accesses likely occurred prior to 2007 and after summer of 2011.

61.     Rasmusson believes that even more unauthorized accesses and viewings will occur in the future if the policies of the Entity Defendants and other police departments and law enforcement agencies similarly situated are not changed to bring the actual custom and practice of these Entity Defendants and others similarly situated into compliance with their own written rules, with the rules of the Department of Public Safety, and with federal law, including the DPPA.

62.     In November 2011, DPS informed Rasmusson's counsel that it was, in fact, investigating 26 entities and their employees regarding this illegal conduct.

63.     At the request of Rasmusson's counsel, DPS provided a list of the entities whose personnel had viewed her private information.

64.     Included in the list provided by DPS to Rasmusson's counsel were law-enforcement departments from the following Defendant Entities:

- City of Bloomington
- City of Burnsville
- City of Cottage Grove
- City of Eagan
- City of Eden Prairie
- City of Lakeville
- City of Minneapolis
- City of Minnetonka
- City of St. Paul
- Ramsey County
- University of Minnesota (Duluth Campus)

65.     Either on their own initiative or upon the request of her counsel, some of the Defendant entities have identified the names of their law enforcement personnel who viewed Rasmusson's private, personal information.

66.     On information and belief, the Individual Defendants used Rasmusson's name, not her license plate number, to look up her private, personal information.

67.     The Eagan Police Department issued Eagan Police Officer Sean Sweeney an oral reprimand for accessing Rasmusson's private data from the DPS database for personal reasons.

68.     The City of Eden Prairie ("Eden Prairie") disciplined three officers for viewing Rasmusson's private, personal information:  Officer Zachary Hessel, Officer Christopher Millard and Sergeant Carter Staaf.  In addition, at least eight other Eden Prairie officers or employees viewed Rasmusson's driver's license information.

69.     Hessel viewed Rasmusson's private information on August 13, 2011, on a computer in the patrol squad room.  There were no incidents related to Rasmusson that day (or any other day).

70.     Hessel was on duty on August 13, 2011, made no traffic stops and had no reason to look up Rasmusson.

71.     Hessel had been trained to use the database on March 11, 2008 and on March 8, 2010.

72.     Hessel admitted to Eden Prairie that he looked up Rasmusson after hearing other Eden Prairie personnel discussing her.  He had met her the day before at a police softball tournament.

73.     Eden Prairie determined that Hessel did not have an official purpose to obtain Rasmusson's private driver's license information.

74.     Eden Prairie issued a letter of warning to Hessel and required him to undergo coaching and retraining on the proper use and access to DVS data.

75.     Millard viewed Rasmusson's private personal information on three separate occasions in 2007 and 2011.  He was on an alarm call and arrest the first time he looked her up. He was also on duty when he did so again in 2011.

11

76. Millard had been trained to use the database on March 18, 2008 and October 15, 2010.

77. Millard looked up Rasmusson's information so that he could obtain her address.

78. Eden Prairie determined that Millard did not have an official purpose to obtain Rasmusson's private driver's license information.

79. Eden Prairie issued a letter of warning to Millard and required him to undergo coaching and retraining on the proper use and access to DVS data.

80. Staaf viewed Rasmusson's private information at least 13 times from January 2007 until May 2011.

81. Staaf had been trained twice on the proper use of the database.

82. Despite that training, Staaf viewed Rasmusson's information while on duty and on both his mobile computer and at his Sergeant's desk.

83. Staaf looked up Rasmusson's present driver's license, as well as her old driver's licenses to compare her photographs.

84. Staaf encouraged his subordinates to conduct their own DVS queries of Rasmusson's information because she was very attractive and so they could see that "she's changed and she's got a new look."

85. Eden Prairie's records also indicate that one "John or Jane Doe" who looked up Rasmusson's personal information at Staaf's suggestion did so "in the middle of a money transport for the Community Center."

86. Staaf has conceded that he did not run Rasmusson's information for a legitimate law-enforcement purpose.

87. Eden Prairie investigative records do not indicate an official, law-enforcement purpose for Staaf to have obtained Rasmusson's private, personal information.

88.     Eden Prairie determined that Hessel did not have an official purpose to obtain Rasmusson's private driver's license information.

89.     As discipline for his conduct related to Rasmusson, Eden Prairie demoted Staaf.

90.     On September 21, 2011, Rasmusson met with a representative of the Minneapolis Police Department ("Minneapolis Police"). While there, Minneapolis Police informed Rasmusson that at least 20 Minneapolis Police officers had viewed her private, personal information. According to the Minneapolis Police, police officers had made inquiries about her as late as June 2011.

91.     On information and belief, DPS has disciplined a few of these Minneapolis police officers to a limited extent.

92.     On information and belief, the Minneapolis Police Department has not disciplined any of its officers for their unauthorized access of Rasmusson's information.

93.     On information and belief, 24 Minneapolis Police officers accessed Rasmusson's record 133 times from 2007 to summer of 2011.

94.     On information and belief, more than those 24 officers in the Minneapolis Police have viewed Rasmusson's record prior to 2007 and more since summer of 2011, along with law enforcement personnel from other departments.

95.     By letter dated January 26, 2012, the Minnesota Department of Public Safety admits that Minnesota State Patrol Trooper Chris Erickson received an oral reprimand and Trooper Dean Grothem received a written reprimand for unauthorized use of the database related to Rasmusson.

96.     Grothem's written reprimand specifically states that he was being disciplined "for accessing private information in the DVS database without a legitimate law enforcement need."

97.     On September 27, 2011, Rasmusson met with a representative of the St. Paul Police Department ("St. Paul Police"). While there, the St. Paul Police was informed Rasmusson that at least 13 St. Paul Police officers and employees viewed her private, personal information.

98.     Upon information and belief, between 2007 and the summer of 2011, St. Paul Police had 42 officers and employees who have accessed Rasmusson's record 175 times, including one female officer who accessed Rasmusson's record 34 times.

99.     On information and belief, more illegal accesses by St. Paul Police occurred prior to 2007 and some likely have occurred after the summer of 2011.

100.     The remaining Individual Defendants' identities (John and Jane Does) are not presently known, because the Defendant Entities have either not provided Plaintiff with their identities or not provided sufficient information to determine if their law enforcement personnel's access to the database was unauthorized, despite her requests. Plaintiff anticipates that these yet-to-be-named Individual Defendants will become known through discovery.

101.     The Supervisor Defendants are not presently known. Plaintiff anticipates that the yet-to-be-named Supervisor Defendants who should have monitored, prevented and stopped the unauthorized access to Rasmusson's information will become known through discovery.

102.     The remaining Entity Defendant identities (Entity Does) are not presently known, because not all of the entities identified by the DPS have provided sufficient information to determine if their law enforcement personnel's access to the database was unauthorized. Plaintiff anticipates that these yet-to-be-named Entity Defendants will become known through discovery.

103.     The login page to the DVS website includes the following admonition:

> Access to this service is for authorized personnel only conducting official business. If you do not have the express authorization, you must exit now or face the consequences of violating Chapter 13 of the Minnesota Statutes and other laws. Further, the State of Minnesota prohibits unauthorized access, disclosure, duplication,

modification, diversion, destruction, loss, misuse, or theft of its
information in accordance with the Minnesota Statutes Sections
609.87 – 609.891.

DVS collects and maintains electronic access data. This data may
be used and disseminated for the purpose of evaluating electronic
government services; to prevent unlawful intrusions into
government electronic systems; or as otherwise provided by law.

104.   On information and belief, the Individual Defendants' training included
admonitions against viewing private driver's license information for unofficial purposes.

105.   Whatever training, monitoring, or inquiry into the officers' usage of the
information systems has been adopted is woefully inadequate to assure that access is used
properly and lawfully.

106.   The Minneapolis Police Department Policy and Procedure Manual prohibits
accessing drivers' license information for anything other than official business.

107.   The City of Eden Prairie's training includes quizzing its law-enforcement officers
as follows:

"1) . . . misuse of the system can lead to sanctions and disciplinary
action; 2) . . . operators may run queries only for criminal justice
purposes; 3) driver's license or motor vehicle registration
information can be accessed through CJDN only for the
performance of official duties authorized by law. 4) **For practice
purposes, you are authorized to complete inquiries on family
members or coworkers? FALSE.**"

(emphasis added).

108.   The City of Eden Prairie Employee Handbook admonishes its employees to
"conduct themselves, both on and off duty, in a manner that supports this trust."

109.   The City of Eden Prairie Employee Handbook states that technology should be
"used primarily for City business. Employees should not use City technology for any purpose
that would reflect negatively on the City."

15

110.    The Eden Prairie Police Department Manual ("EPPD Manual") informs officers that its policies "also applies to off-duty conduct."

111.    The EPPD Manual explains that "[p]eace officers shall observe the confidentiality of information available to them due to their status as peace officers."

112.    The EPPD Manual clearly states that officers should not use their official position for personal gain:

> Peace officers shall not use the authority of their position as peace officers, or information available to them due to their status as peace officers, for any purpose of personal gain, including, but not limited to, initiating or furthering personal and/or intimate interactions of any kind with persons which (sic) whom the officer has had contact while on duty.

113.    The EPPD Manual also informs its officers that "Minnesota driver license information obtained or otherwise accessed through a CJDN terminal or the DVS website may be disseminated to authorized law enforcement personnel in the performance of their official duties."

114.    On information and belief, despite this training, Defendant Entities and Defendant Supervisors, allowed their employees, including but not limited to the Individual Defendants, to view Plaintiff's private driver's license information for unlawful purposes.

115.    On information and belief, Defendant Entities, Defendant Supervisors and Commissioner Defendants permitted, condoned, or acquiesced in this illegal access to Plaintiff's private information, and knew or should have known that it was occurring.

116.    On information and belief, this illegal access occurs with regularity not only of Plaintiff's private information, but of other Minnesota drivers' private information.

117.    Defendant Entities, Defendant Supervisors and Defendant Commissioners have lax policies or lax enforcement of these policies that allow for these intrusions.

118.    Defendant Entities, Defendant Supervisors and Defendant Commissioners either have no viable method of or have an inadequate method of ascertaining and controlling the illegal access to individuals' private information by their officers.

119.    The extent of this illegal access appears to be widespread and pervasive throughout departments, and is a custom and practice.  This is demonstrated by the tolerance of this practice, and the customary disregard of punishment for violations, such as a prosecution that was dismissed when the officer's attorney complained that the prosecution was akin to "using a sledge hammer to kill a fly" or words to that effect.  Further evidence of the custom and practice can be found in actual statements made by current officers, one of whom was quoted in a magazine article about the illegal access into Rasmusson's privacy as saying that "every single cop in the state has done this.  Chiefs on down." ; and based on actual statements made by former officers, one of whom was quoted in a magazine article about the illegal access into Rasmusson's privacy as saying that "[y]ou used to look up people without a second thought. You'd look up old friends from high school or just someone you used to know."

120.    On further information and belief, this illegal access to driver's license information occurs disproportionately to women.

121.    When Defendant law-enforcement personnel viewed Rasmusson's private information, they did not do so to carry out official police functions.

122.    Rasmusson committed no crimes that would authorize the unauthorized access of her private drivers' license information.

123.    The Individual Defendants obtained Rasmusson's personal information without probable cause or reasonable suspicion.

124.    Rasmusson never waived the protections of the DPPA.

### III.   Rasmusson Has Been Harmed By This Intrusion Into Her Private Life

125.   The sheer volume of these intrusions into her private life demonstrates that law-enforcement personnel are unfairly hostile toward Rasmusson's privacy and safety.

126.   As a result of this invasion of privacy, Rasmusson does not feel comfortable going to public places where police officers are likely to be around and has lost her sense of freedom including her freedom to travel and enjoy public places.

127.   As a result of this invasion of privacy, Rasmusson has become a recluse and was forced to live like a hermit.

128.   As a result of this invasion of privacy, Rasmusson feels she has lost any control over the privacy in her life.

129.   As a result of this invasion of privacy, Rasmusson has shut down her social media accounts.

130.   As a result of this invasion of privacy, Rasmusson has installed a security gate and an alarm system on her property.

131.   As a result of this invasion of privacy, Rasmusson has changed and unlisted her home and mobile telephone number.

132.   As a result of this invasion of privacy, Rasmusson has changed her email address.

### COUNT I

*(Against Individual, Supervisor and Entity Defendants, including John, Jane and Entity Does, for Violations of the DPPA, 18 U.S.C. § 2721, et seq.)*

133.   Plaintiff reaffirms and realleges the alleagations in Paragraphs 1 through 132 as though fully set forth in this Paragraph 133.

134.   Rasmusson provided personal information to the DPS including her address, color photograph, date of birth, weight, height and eye color for the purpose of acquiring and utilizing a State of Minnesota driver's license.

135.    The DVS database also maintained Rasmusson's driving record.

136.    At no time did Rasmusson provide her consent for any of the Defendant Individuals to obtain, disclose or use, or for any of the Defendant Entities or Defendant Supervisors to allow Defendant Individuals to obtain, disclose or use, her private information for anything but official law-enforcement business.

137.    Intentionally obtaining, disclosing or using driver's license information without an authorized purpose is a violation of the DPPA. The statute provides for criminal fines and civil penalties. 18 U.S.C. §§ 2723, 2724.

138.    The DPPA provides redress for violations of a person's protected interest in the privacy of her motor vehicle records and the identifying information therein.

139.    The Defendants, each of them, have invaded Rasmusson's legally protected interest under the DPPA.

140.    According to the Department of Vehicle Services and the Defendant Entities, the Individual Defendants knowingly obtained, disclosed or used Rasmusson's personal information, from a motor vehicle record, for a purpose not permitted under the DPPA. 18 U.S.C. § 2724(a).

141.    None of the Individual Defendants' activities fell within the DPPA's permitted exceptions for procurement of Rasmusson's private information.

142.    By the actions described above, each Defendant Individual law-enforcement personnel was acting within the scope of his or her employment when he or she obtained, disclosed or used Rasmusson's personal information from the DVS database for an impermissible purpose.

143.    The Individual Defendants knew that their actions related to Rasmusson's personal information were in violation of the DPPA.

144.    The Defendant Entities and Defendant Supervisors knowingly authorized, directed, ratified, approved, acquiesced in, committed or participated in obtaining, disclosing or using of Rasmusson's private personal information by the Individual Defendants.

145.    The Individual Defendants used the Defendant Entities' computers, passwords and passcodes to obtain Rasmusson's private information.

146.    The sheer volume of law-enforcement personnel that obtained, disclosed or used Rasmusson's private personal information, especially given Rasmusson's lack of a criminal record, makes apparent that Defendants' use was not permissible.

147.    The Defendant Entities are each vicariously liable for the acts of Defendant Individuals.

148.    Rasmusson has suffered harm because her private information has been obtained unlawfully.  Rasmusson suffered and continues to suffer harm by virtue of the increased risk that her protected information is in the possession of numerous law-enforcement personnel who obtained it without a legitimate purpose.  This is precisely the harm Congress sought to prevent by enacting the DPPA and its statutory remedies.

149.    The Individual Defendants, Supervisor Defendants and Entity Defendants each willfully and recklessly disregarded the law, entitling Rasmusson to punitive damages under the DPPA, see 18 U.S.C. § 2724(b)(2), which is not subject to the pleading requirement of Minnesota state law as set forth in Minn. Stat. section 549.20.  Plaintiff is entitled to actual damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and such other preliminary and equitable relief as the court determines to be appropriate.  18 U.S.C. § 2724(b).

150.    In addition, under the DPPA, Plaintiff is entitled to a baseline liquidated damages award of at least $2,500 for each violation of the DPPA.  18 U.S.C. § 2721(b)(1).  Rasmusson need not prove actual damages to receive said liquidated damages.

## COUNT II

*(Against Individual Defendants, including John and Jane Does, for Violation of 42 U.S.C. § 1983)*

151.     Plaintiff reaffirms and realleges the allegations in Paragraphs 1 through 150 as though fully set forth in this Paragraph 151.

152.     At no time did Rasmusson behave in a manner that would provide any legal justification for the above-described invasion of her privacy.

153.     The DPPA establishes that obtaining an individual's driver's license information without a legitimate purpose constitutes an illegal search under the meaning of the Fourth Amendment to the Bill of Rights.

154.     The Individual Defendants' viewing of Rasmusson's personal information was unauthorized, unjustified, and excessive, and violates the Fourth Amendment, the laws of the United States and the laws of the State of Minnesota.

155.     By the actions described above, each Individual Defendant Law-Enforcement Personnel, acting under color of state law, violated and deprived Rasmusson of her clearly established and well-settled civil right to be free from an unconstitutional search.

156.     The acts of each Defendant Law-Enforcement Personnel, acting under the color of state law, constituted an invasion or repeated invasions of Rasmusson's clearly-established privacy rights, guaranteed by the Bill of Rights and the Fourteenth Amendment to the United States Constitution, the laws of the United States, including the DPPA, and the laws of the State of Minnesota.

157.     The DPPA creates an individual right to privacy in a person's driver's license information, thereby prohibiting unauthorized accessing of all persons' information, including Rasmusson's information.

158.    Each individual law-enforcement personnel, acting under color of state law, knew that his or her actions violated and deprived Rasmusson of her clearly established statutory rights under the DPPA.

159.    Each Individual Defendant law-enforcement personnel deprived Rasmusson of her federal statutory rights and civil rights maliciously or by acting with reckless disregard for whether Rasmusson's rights would be violated by his or her actions.

160.    Each Individual Defendant law-enforcement personnel was deliberately indifferent to Rasmusson's statutory and civil right to be free from illegal searches, invasions of privacy and the unauthorized accessing of her private driver's license information.

161.    As a direct and proximate result of the acts and omissions of the above-named Individual Defendants, Rasmusson endured physical and mental suffering, and was damaged in an amount yet to determined, but believed to be well in excess of One Million ($1,000,000) Dollars.

162.    Punitive damages are available against Individual Defendant law-enforcement personnel for their reckless and callous disregard for Rasmusson's rights and their intentional violations of the federal law, and are hereby claimed as a matter of federal common law, <u>Smith v. Wade</u>, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirement for punitive damages set forth in Minn. Stat. § 549.20.

163.    Plaintiff is entitled to recovery of her costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

## COUNT III

*(Against Entity Defendants and Supervisor Defendants, including John, Jane and Entity Does, for violation of 42 U.S.C. § 1983)*

164.    Plaintiff reaffirms and realleges the allegations in Paragraphs 1 through 163 as though fully set forth in this Paragraph 164.

165.    The Individual Defendants' numerous accesses of Rasmusson's private

information are not unique, but one example of how frequently such law-enforcement agencies

customarily violate the DPPA by accessing private driver's license information of persons

without having any legitimate or permissible reason for doing so.

166.    Recently, in a magazine article about the illegal access into Rasmusson's private

information, a current officer, speaking anonymously to avoid retaliation, stated that every

officer does it, including the chiefs of police.  In that same article, another former officer stated

that the practice was widespread as a form of social media, simply to look up former friends or

acquaintances.

167.    In addition, persons familiar with police departments and those involved in

teaching supervisors how to train and hold accountable their subordinate law-enforcement

personnel have been told by those supervisors that the unlawful and impermissible accessing of

private information is among the most frequently committed wrongs by police, for which they

are seldom if ever held accountable.

168.    The foregoing information, other information to be presented at trial, and

evidence reasonably likely to be determined after full discovery demonstrate that the improper

access of citizens' driver's license information by Defendant Law-Enforcement Personnel for

their own personal and private uses, obtained by accessing that information through the

computerized information storage system kept by the state for official purposes only, is an

official custom or practice well known to Defendant Supervisors.

169.    These customs and practices by Defendant Law-Enforcement Personnel are at

variance with the written rules set down by the Entity Defendants, but these formal rules are

widely and knowingly disregarded.

170.    Given the municipalities' failure to monitor and enforce their rules, the aforementioned customs and practices are attributable to the municipalities themselves, including the Entity Defendants herein.

171.    The Defendant Entities and the Defendant Supervisors of the law-enforcement personnel accessing this information knew or should have known of this and other unlawful, improper, unjustified, and impermissible access to private information by law-enforcement personnel.

172.    The prevalence of this custom, the lack of monitoring regarding these access practices and the failure to take action to stop or prevent these practices, demonstrate the state of mind of Defendant Supervisors and municipal officials of the Entity Defendants.  These customs and practices further demonstrate Defendants' deliberate indifference to the federal statutory and constitutional rights of the citizens and persons, including Plaintiff, whose information has been wrongfully accessed.

173.    The Defendant Entities, in their official capacity, are directly liable for the custom and practice of the widespread illegal access of citizens' driver's license information.  The Supervisor Defendants, up to and including the chief police officers employed by each Entity Defendant, are liable in their individual capacity.  Defendants' liability is due to their actual and constructive knowledge of this practice, their failure to institute any process for monitoring and preventing it and their deliberate indifference to the federal rights of those persons, including Plaintiff, whose information has been and continues to be wrongfully accessed.

174.    In addition, the Defendant Supervisors of the law-enforcement personnel, up to and including the chief police officer in each of the Defendant Entities, are liable in their individual capacities for the failure to train, monitor, supervise, and properly discipline the officers who are improperly and unlawfully accessing the private driver's license information of citizens, including Plaintiff, without a proper, lawful, permissible, justifiable purpose for doing

so. This pattern of failure to train, monitor, supervise, and discipline demonstrates the state of mind of these Defendant Supervisors and a deliberate indifference to the rights of the citizens and others whose information has been so widely accessed, including Plaintiff.

175.    The federal rights of the citizens, including Plaintiff, whose information is improperly accessed, are held in light regard by many if not most of the Defendant Supervisors and by the Defendant Entities themselves.

176.    Defendants' lack of concern evidences their deliberate indifference both to the problem of the unauthorized access and to the impact of the unauthorized access on the federal rights of the citizens, including Plaintiff, who would often be unaware of that access.

177.    Defendants' lack of concern is evidenced by the failure of most Defendant Entities to take any sort of corrective action upon learning that multiple improper, unlawful, unjustified accesses of Plaintiff's information had taken place.  Defendants have also consistently refused to fully involve Plaintiff, keep her fully informed of the progress of the investigation into the persons accessing her information, or to advise her of their identities, their reasons for accessing her information, their knowledge of Plaintiff, and any discipline imposed on them for their improper and illegal conduct.

178.    The manner in which the investigation was handled by the Entity Defendants and Supervisor Defendants provides little expectation that these and other law-enforcement personnel will cease accessing Plaintiff's private information and the private information of other persons similarly situated to Plaintiff, without a justifiable, permissible basis.

179.    To the best of Plaintiff's knowledge, no system has been established by the Entity Defendants and Supervisor Defendants to monitor the regular access of the DVS database by law-enforcement personnel.

180.    To the best of Plaintiff's knowledge, no reviews have taken place of other accesses of the DVS database by these same law-enforcement personnel, or of other officers and employees in the Defendant Entities.

181.    To the best of Plaintiff's knowledge, no attempt has been made by the Entity Defendants and Supervisor Defendants to protect and safeguard the rights of other persons' DVS database information.

182.    To the best of Plaintiff's knowledge, no attempt has been made by the Entity Defendants and Supervisor Defendants to provide redress and assurance to the persons, including Plaintiff, whose DVS information has been wrongfully accessed by the Defendant Law-Enforcement Personnel named in this Complaint, or by other officers in the municipalities named in this Complaint.

183.    Defendants' accesses have been widely discussed among the Defendant Law-Enforcement Personnel committing the accesses as well as among other personnel in the Defendant Entities – all of which have damaged Plaintiff and her reputation, including but not limited to her reputation as a single woman.

184.    The reputational damage alone to Plaintiff, as well as the knowledge that this activity is not merely unlawful but a federal crime, should have been enough to ensure that Plaintiff's concerns listed in the preceding paragraphs were addressed by Defendants in a meaningful fashion.  Holding accountable the law-enforcement personnel engaged in an unlawful activity would have been an important step in eliminating this custom and practice of permitting the widespread illegal accessing of Rasmusson's information; yet nothing meaningful in this regard has been accomplished, and no prosecutions have been initiated to the best of Plaintiff's knowledge.

185.    As a direct and proximate result of the acts and omissions of the above-named Defendant Entities and Defendant Supervisors, Rasmusson has endured and continues to endure physical and mental suffering, and has been damaged in an amount yet to determined and of a continuing nautre, but believed to be well in excess of One Million ($1,000,000) Dollars.

186.    Punitive damages are available against Defendant Supervisors and Defendant Entities for their reckless and callous disregard for Rasmusson's rights and their intentional violations of the federal law, and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

187.    Plaintiff is entitled to recovery of her costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

## COUNT IV

*(Against Commissioner Defendants for violation of 42 U.S.C. § 1983)*

188.    Plaintiff reaffirms and realleges the allegations in Paragraphs 1 through 187 as though fully set forth in this Paragraph 188.

189.    Defendant Campion was Commissioner of DPS from April 2004 to February 2011.

190.    Defendant Dohman became Commissioner of DPS in March 2011 and presently serves in that role.

191.    As DPS Commissioners, Campion and Dohman were and are responsible for creating, maintaining, and providing access to the database that included Plaintiff's driver's license information.

192.    Defendant Commissioners also had the ability to determine if unauthorized access was being made and to prevent such unauthorized access to the database, including of Plaintiff's driver's license information, and have the ongoing duty to prevent such unauthorized accesses.

193.    The Commissioner Defendants failed to prevent unauthorized access to the database, including Plaintiff's driver's license information.

194.    The actions of the Commissioner Defendants, as alleged, violate the rights of the Plaintiff under the Fourth and Fourteenth Amendments to the United States Constitution.

195.    On information and belief, the Commissioner Defendants created or oversaw the creation and maintenance of a database and system that was supposed to prevent unauthorized access to driver's license information.

196.    From 2007, Commissioner Defendants allowed unauthorized access of Rasmusson's driver's license information such that approximately 100 law-enforcement personnel from 18 different departments accessed her information over 400 times.

197.    On information and belief, Commissioner Defendants' efforts have been insufficient to prevent future unauthorized access of Plaintiff's and other individuals' private, personal information.

198.    Commissioner Defendants have sanctioned the constitutional violations by the Defendant Law-Enforcement Personnel through their failure to remedy the policy, custom and practice of officers' and employees' unfettered and unauthorized access to the database.

199.    Commissioner Defendants have been grossly negligent in supervising subordinates responsible for implementing a law-enforcement database that prevents unauthorized access to private, personal information.

200.    On information and belief, Commissioner Defendants failed to monitor and prevent unauthorized access to private, personal information even though they knew or should have known that such unconstitutional acts were occurring.

201.    Commissioner Defendants, acting under the color of state law, were deliberately indifferent to Rasmusson's constitutionally-recognized and federal statutory rights to be free

from illegal searches, invasions of privacy and the unauthorized accessing of her private driver's license information.

202.   As a direct and proximate result of the acts and omissions of the above-named Commissioner Defendants, Rasmusson was forced to endure physical and mental suffering, and was thereby damaged in an amount yet to determined, but believed to be well in excess of One Million ($1,000,000) Dollars.

203.   Punitive damages are available against Commissioner Defendants for their reckless and callous disregard for Rasmusson's rights and their intentional violations of the federal law, and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

204.   Plaintiff is entitled to recovery of her costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

## COUNT V

*(Against All Defendants, including John, Jane and Entity Does, for Common Law Invasion of Privacy)*

205.   Plaintiff reaffirms and realleges the alleagations in Paragraphs 1 through 204 as though fully set forth in this Paragraph 205.

206.   By improperly obtaining Rasmusson's private personal information for impermissible reasons, Defendants intentionally intruded upon the solitude or seclusion of Rasmusson's private affairs and concerns.

207.   The Defendants' intrusion would be highly offensive to a reasonable person.

208.   The Defendants' intrusion caused Rasmusson to suffer severe emotional distress and physical harm.

209.   The Defendants' intrusion was intended to cause Rasmusson to suffer severe emotional distress and physical harm, and was made with either actual or legal malice, or with reckless disregard of her rights and her privacy.

210.   Plaintiff is entitled to tort damages for Defendants' invasion of privacy.

## JURY DEMAND

211.   Plaintiff demands a jury trial as to all issues of fact herein properly triable to a jury under any statute or under common law.

WHEREFORE, Plaintiff Anne Marie Rasmusson prays for judgment against the Defendants as follows:

1.   A money judgment against all the Defendants for liquidated, actual and compensatory damages in an amount in excess of One Million ($1,000,000) Dollars and punitive damages in an amount to be determined by the jury, together with her costs, including reasonable attorney fees, under 42 U.S.C. § 1988, the DPPA, and other applicable laws, and prejudgment interest;

2.   Actual damages, punitive damages, attorneys' fees and other litigation costs and such other preliminary and equitable relief as the court determines to be appropriate under 18 U.S.C. § 2724(b);

3.   Liquidated damages of at least $2,500 for each violation of the DPPA under 18 U.S.C. § 2721(b)(1);

4.   An injunction, permanently enjoining all Defendants from viewing Plaintiff's private information in violation of the DPPA, unless necessary for law enforcement purposes;

5.   A permanent injunction, barring Defendant Individuals from trespassing or instructing proxies to trespass on Plaintiff's property or otherwise harass her or infringe in any way on her privacy and her right against the invasion of her privacy;

6.    A permanent injunction, allowing Plaintiff to use a post-office box in place of an

address on her Minnesota Driver's License; and,

7.    For such other and further relief as this Court deems just and equitable.

**SAPIENTIA LAW GROUP PLLC**


Dated:  March 12, 2012

Jonathan A. Strauss (#0279602)
Lorenz F. Fett (#196769)
Lori D. Semke (#0296910)
Kenneth H. Fukuda (#0389301)
12 South Sixth Street, Suite 1242
Minneapolis, MN  55402
(612) 756-7100

*Attorneys for Plaintiff*